J-S96006-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HUGO BAEZ, | |
| Appellant | No. 1931 WDA 2015 |

Appeal from the Judgment of Sentence Entered January 30, 2015
In the Court of Common Pleas of Blair County
Criminal Division at No(s): CP-07-CR-0002740-2013

BEFORE:  BENDER, P.J.E., BOWES, J., and SOLANO, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED FEBRUARY 28, 2017**

Appellant, Hugo Baez, appeals *nunc pro tunc* from the judgment of sentence of an aggregate term of 30-60 years' incarceration, imposed after a jury found him guilty of third-degree murder, two counts of aggravated assault, and related offenses.  Appellant argues that the evidence was insufficient to convict him of third-degree murder and both counts of aggravated assault. He also contends that the trial court erred by denying his suppression motion directed at the fruits of a search warrant, and by admitting a photograph of the murder victim.  Appellant also challenges the legality and discretionary aspects of his sentence.  After careful review, we affirm.

The trial court provided the following brief summary of the facts adducted at trial:

On October 31, 2013, … Appellant and Brandon Midder entered the Choices … nightclub in Altoona, PA[,] together and were periodically together in the club. Jacob Dormevil was walking to the bathroom and … Appellant said, "What's up" to him. Dormevil said "What's up" back to … Appellant, who responded[,] "Do you want to take this outside?" Dormevil responded "Yeah," and began taking his shirt off and walking around the pool table towards the exit. … Appellant followed Jacob Dormevil. Willie Solomon, Dormevil's brother, followed both of them. Dormevil exited the building. He turned to punch Appellant, who shot at him with a handgun first. Appellant fired a second shot at Dormevil. Willie Solomon then grabbed the Appellant, who shot him multiple times. Dormevil repeatedly tried to come back into the bar but was prevented from doing so by [Appellant] and Brandon Midder pointing guns at him. Willie Solomon passed away from his gunshot wounds that night. The events inside the club, and partially outside the club, were captured on security videotape that was Commonwealth's Exhibit 2.

Corporal Moser of the Altoona Police Department was informed of the shooting at Choices … and the death of Willie Solomon and was told that "Juice" was the shooter. He was also told that Brandon Midder was at the club during the shooting. He saw Midder's car in [the borough of] Tyrone that night and followed it in connection with the shooting investigation. The car contained two black males. Corporal Moser thought … Appellant, whom he knew as "Juice" or James Santos, was in the car and heading out of the area. Midder stopped at the Martin's store in Alexandria[,] and officers identified him as the driver of his car. The passenger stayed in the car. Midder pulled out of the Martin's [store] without using his turn signal and with a faulty license plate light. Troopers stopped the car. One trooper approached each side of the car and asked the driver and the passenger for their names. The passenger replied, "James Santos." At that time, Moser told the trooper that the passenger was a suspect in the homicide investigation and the men were removed from the car and detained. Corporal Moser gave the man who identified himself as James Santos his **Miranda**[1] warnings, at which time he invoked them and remained silent.

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

The officers did not ask him any other questions regarding the incident. The man was fingerprinted and identified as … Appellant, Hugo Baez.

Trial Court Opinion (TCO), 1/29/16, at 1-3.

The Commonwealth filed a criminal information in this case on January 10, 2014. With respect to the victim, Willie Solomon, Appellant was charged with criminal homicide, 18 Pa.C.S. § 2501, two counts of aggravated assault, 18 Pa.C.S. § 2702, and reckless endangerment, 18 Pa.C.S. § 2705. Regarding the victim, Jacob Dormevil, Appellant was charged with aggravated assault and reckless endangerment. Additionally, the Commonwealth charged Appellant with false identification to law enforcement, 18 Pa.C.S. § 4914, and carrying a firearm without a license, 18 Pa.C.S. § 6106.

Appellant filed a pre-trial motion seeking, inter alia, suppression of evidence discovered pursuant to a search warrant directed at Appellant's iPhone.[2] The trial court denied the suppression motion in an opinion and order dated September 15, 2014. Pretrial Opinion, 9/15/2014, at 10. A jury trial was held on December 1-5, 2014, with respect to all charges but for the firearm offense.[3] The jury acquitted Appellant of first-degree murder, but found him guilty of third-degree murder, both counts of aggravated assault,

_____

[2] Appellant also sought suppression of other evidence; however, those matters are not at issue in the instant appeal.

[3] By order dated September 15, 2014, the trial court granted Appellant's motion to sever the firearm offense.

- 3 -

and providing false identification to law enforcement. Separately, on January 12, 2015, Appellant pled guilty to carrying a firearm without a license.

The trial court sentenced Appellant on January 30, 2015. The offenses committed against the deceased (Mr. Solomon), third-degree murder, one count of aggravated assault (Section 2702(a)(1)), and reckless endangerment, merged for sentencing purposes. However, the court determined that the second aggravated assault count (Section 2702(a)(4)) pertaining to Mr. Solomon did not merge for sentencing purposes because there were separate gunshots and separate, non-fatal wounds inflicted. The offenses that Appellant committed against Mr. Dormevil (aggravated assault and reckless endangerment) also merged for sentencing purposes. Ultimately, the court sentenced Appellant to consecutive terms of 20-40 years' incarceration for third-degree murder and 5-10 years' incarceration for each of the unmerged aggravated assault counts. The court sentenced Appellant to concurrent terms of incarceration for the remaining offenses.[4] Thus, Appellant was sentenced to an aggregated term of 30-60 years' incarceration.

_____

[4] The court sentenced Appellant to 2-4 years' incarceration for the firearm offense, and 6-12 months' incarceration for false identification to law enforcement, both of which were set to run concurrent to Appellant's murder and assault sentences.

- 4 -

Appellant subsequently filed a post-sentence motion on February 9, 2015. That motion was denied by operation of law on June 9, 2015; however, the clerk of courts failed to issue notice of that denial pursuant to Pa.R.A.P. 720(B)(3)(c) ("When a post-sentence motion is denied by operation of law, the clerk of courts shall forthwith enter an order on behalf of the court, and, as provided in Rule 114, forthwith shall serve a copy of the order on the attorney for the Commonwealth, the defendant's attorney, or the defendant if unrepresented, that the post-sentence motion is deemed denied."). Consequently, Appellant filed a Post Conviction Relief Act petition, *see* 42 Pa.C.S. § 9541 *et seq.*, seeking reinstatement of his direct appeal rights *nunc pro tunc*. By order dated November 13, 2015, Appellant's direct appeal rights were reinstated. Appellant filed a *nunc pro tunc* notice of appeal on December 8, 2015. He filed a court-ordered, Pa.R.A.P. 1925(b) statement on December 29, 2015. The trial court issued its Rule 1925(a) opinion on January 29, 2016.

Appellant now presents the following questions for our review:

1. Whether the evidence [was sufficient] to convict … Appellant of third-degree murder and aggravated assault with a deadly weapon of Willie Solomon, inasmuch as the Commonwealth did not prove[,] beyond a reasonable doubt[,] negation of self-defense pursuant to 18 Pa.C.S. § 505?

2. Whether the evidence [was sufficient] to convict … Appellant of aggravated assault with a deadly weapon of Jacob Dormevil, inasmuch as the Commonwealth did not prove[,] beyond a reasonable doubt[,] negation of self-defense pursuant to 18 Pa.C.S. § 505[,] nor did it prove an attempt to cause bodily injury with a deadly weapon?

- 5 -

3. Whether the trial court erred by denying suppression of a search warrant inasmuch as the affidavit of probable cause was predicated on the affiant's unconfirmed conclusions?

4. Whether the trial court abused its discretion in admitting a photograph of the murder victim, taken before the transaction [*sic*] at issue, that was not relevant?

5. Whether the trial court erred in refusing to merge at sentencing the crime of aggravated assault with a deadly weapon with third-degree murder as a lesser-included offense thereof inasmuch as the deadly weapon element of aggravated assault with a deadly weapon is included within the elements of third-degree murder?

6. Whether the trial court abused its discretion in imposing [a] sentence that focused on the seriousness of the crimes to the detriment of other sentencing factors?

Appellant's Brief at 11-12 (unnecessary capitalization omitted).

Appellant's first two claims concern the sufficiency of the evidence.

Our standard of review of sufficiency claims is well-settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

More specifically, Appellant's first sufficiency claim, and the first part of his second sufficient claim, concern self-defense. With respect to both,

Appellant asserts that the Commonwealth failed to produce sufficient evidence to disprove his self-defense claim. Self-defense is governed by 18 Pa.C.S. § 505. Generally speaking, "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S. § 505(a).

> [T]he Commonwealth must disprove a claim of self-defense beyond a reasonable doubt. And it is also the case that a successful claim of self-defense negates the element of malice, as the two concepts are mutually exclusive. To negate a claim of self-defense, the Commonwealth is required to prove any one of the following: (1) the defendant's belief that it was necessary to kill the victim in order to protect himself from death or serious bodily harm was unreasonable; (2) the defendant provoked the use of force; or (3) the defendant had a duty to retreat and could safely do so.

*Commonwealth v. Gonzales*, 609 A.2d 1368, 1370 (Pa. Super. 1992) (internal citations omitted).

> Appellant argues that the evidence in this case
>
> demonstrated that [he] had been trapped in a narrow passageway between two aggressors and could believe, quite reasonably under the circumstances, that each of Mr. Solomon and Mr. Dormevil could have been armed. …
>
> The Commonwealth did not prove beyond a reasonable doubt that [Appellant] was not free from fault in provoking or continuing the difficulty—since Mr. Dormevil was the aggressor—or that he did not believe that such force was necessary to protect himself against death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat—since, under the circumstances, he had reason to believe that he had been caught in a deadly trap—or that he violated a duty to retreat or

- 7 -

to avoid the danger—since, having been trapped between the two in a narrow passageway, he could not retreat.

Appellant's Brief at 23.

The trial court's analysis of Appellant's claim is cursory. The court merely states that the jury heard Appellant's self-defense claim and rejected it. TCO at 23-24. However, Appellant's claim(s) also lack any significant analysis of existing caselaw, and is self-servingly selective in its citation from the record. Generally, he asserts that the jury lacked sufficient evidence to reject his self-defense claim on one of the following bases: 1) that Appellant *unreasonably* believed that death or serious bodily injury was imminent, or that the use of deadly force was required to stop it; 2) that Appellant did not provoke the violence; or 3) that Appellant was unable to safely retreat. ***See Gonzales***, ***supra***.

We will not address every conceivable basis upon which the jury could have rejected Appellant's self-defense claim. Appellant's self-defense claim (applied to both victims) is adequately undermined if a sufficient basis existed to find the presence of any one of the aforementioned ***Gonzales*** factors. There was, in fact, testimony which sufficiently supported the presence of *at least* one of those factors.

At trial, Tiffany Ellis testified that Appellant *followed* one of the victims, Dormevil, out of the bar, under the pretext that the two were going to engage in a fist fight. N.T., 12/1/14, at 182-83. This is corroborated by the video footage of the shooting, which showed Appellant's following Dormevil out a door, as Dormevil is removing his shirt. Immediately thereafter,

Appellant, with his gun already in hand, returned in through the door, where he is then confronted by Solomon. Appellant is then seen firing several shots at Solomon as the two tussled.

The video is certainly subject to some degree of interpretation. That is, the video evidence did not, on its face, completely refute or confirm the self-defense theory proffered by Appellant. The video did not show what happened outside the door exited by Appellant and Dormevil, although it does show that whatever occurred outside must have been extremely brief in duration – a matter of seconds, at most. The video then shows Appellant returning in through the same door, visibly armed, almost immediately after the two exited.

It is Appellant's contention that this evidence was consistent with his version of events, that he drew his weapon to defend himself from Dormevil, retreated through the door, where Solomon then attacked him. However, the evidence is also consistent with the Commonwealth's version of events, that Appellant ambushed Dormevil with a gun, just after the two exited the door; *i.e.*, that Appellant challenged Dormevil to engage in an unarmed physical altercation, only to pull a gun on him before it began. Then, when Solomon rushed to Dormevil's aid, Appellant shot him during a scuffle.

To the extent that Appellant is claiming the video evidence demonstrated his version of events, rather than the Commonwealth's, we conclude that Appellant is challenging the weight, not the sufficiency, of the evidence. Viewed in a light most favorable to the Commonwealth, the video

evidence was entirely consistent with the Commonwealth's theory that Appellant had ambushed an unsuspecting Dormevil, who thought he was about to engage in a fist fight, and then proceeded to shoot Solomon when Solomon rushed to Dormevil's aid. The jury was free to interpret the video in a manner which favored the Commonwealth's version of events, and to discount Appellant's version.

Significantly, however, the video was not the entirety of the Commonwealth's evidence concerning the shooting. In addition to Ellis' testimony, Dormevil also testified, consistent with Ellis' testimony, that he believed he was exiting the club with Appellant in order to engage in a fist fight, but he was ambushed by an armed Appellant when they got outside:

> Q. All right. Tell the members of the jury what happened.
>
> A. I was sitting at the bar with [Solomon] and Tiffany [Ellis] and I had to use the bathroom. I told [Solomon] I was going to the bathroom. I noticed that [Appellant] was looking at me in a weird way. So, I … returned the gesture and he stated, what's up and I said, what's up back to him and he said, you want to take this outside[,] and I said, yes.
>
> Q. At that time, Mr. Dormevil, what did you believe you were taking outside or why you would be going outside if you chose to go outside?
>
> A. To engage in a fist fight.

N.T., 12/2/14, at 654. Dormevil stated, again consistent with Ellis' version of events, that he removed his sweatshirt, and proceeded to leave the building with Appellant immediately behind him. *Id.* at 654-55. Dormevil then described what occurred when he and Appellant exited the building:

- 10 -

Q.    Once you hit the hallway, where did you go?

A.    I went outside of the front door.

Q.    And as soon as your foot hit the threshold of the outside doorway, what did you do?

A.    I turned around.

Q.    Why did you turn around?

A.    Because I was gonna hit him.

Q.    Okay.  Hit him with what?

A.    I was gonna punch him.

Q.    When you say, "hit him," who is he?

A.    [Appellant].

A.    Okay.  When you turned around to punch [Appellant], what did you see?

Q.    A gun.

A.    What was the gun doing?

Q.    It was being fired in my face.

A.    How could you tell it was being fired?

Q.    I heard the sound and I see the flash right in front of my face.

A.    What was the gun doing?

Q.    It was being fired in my face.

*Id.* at 655-56.

Dormevil's testimony constituted sufficient evidence from which the jury could have concluded that Appellant, rather than Dormevil or Solomon, provoked the violence that occurred.  First, it was Appellant who challenged Dormevil to a fight.  Second, under Dormevil's version of events, Appellant

must have pulled his gun before Dormevil turned around to strike him. Third, because Appellant had already fired the weapon at Domevil before he went back inside, Solomon appears to have been reacting to Appellant's initial aggression, not vice versa. Nothing in Dormevil's version of events was contradicted by the video evidence. Indeed, the video evidence was entirely consistent with his testimony.

Accordingly, we conclude that Appellant's self-defense-based sufficiency claims lack merit. The evidence, viewed in a light most favorable to the Commonwealth, was sufficient to demonstrate that Appellant was the initial aggressor (twice over), thereby undermining his claim of self-defense.[5]

Under the second part of Appellant's second claim, he asserts that the evidence was insufficient to prove aggravated assault, in that it was inadequate to demonstrate his intent to cause bodily injury to Dormevil with a deadly weapon. This claim is meritless. According to Dormevil's testimony, Appellant fired his gun at Dormevil's face, twice, from point-blank

_____

[5] We also believe the evidence was sufficient to demonstrate that, even if Appellant believed he was subjected to a threat requiring the use of deadly force in self-defense, the jury could have reasonably concluded that that belief was unreasonable, given that both of his victims were unarmed. Moreover, the fact that Appellant willingly followed Dormevil out the door under the auspices of engaging in a fist fight could have reasonably led the jury to conclude that he did not, in fact, possess such a belief when the shooting began. Rather, such evidence could have led to the reasonable inference that Appellant, acting with malice, intended to shoot Dormevil before any threat materialized.

or near-point-blank range. This evidence was more than sufficient to demonstrate an intent to cause bodily injury. Indeed, such evidence is ordinarily sufficient to demonstrate intent to kill. *See Commonwealth v. LaCava*, 666 A.2d 221, 226 (Pa. 1995) ("The specific intent to kill needed to support a first-degree murder conviction can be proven by use of a deadly weapon upon a vital part of the victim's body.").

Appellant argues, however, that "because those two shots had been fired at point-blank range, but not actually placed in contact, and Mr. Dormevil was not hit, it can only be inferred that the shooter, Mr. Baez, did not intend to injure Mr. Dormevil with those two shots." Appellant's Brief at 25. This argument essentially fails on its face. That Appellant did not intend to harm Dormevil is most certainly *not* the only rational inference from the fortunate fact that Dormevil was not hit. It is not unreasonable to believe that Appellant unintentionally missed shooting Dormevil in the head, due to either his own ineptitude with the gun or Dormevil's quick defensive reaction. Indeed, Dormevil testified that he tried to push the gun away from his face when he saw it, and then dove to the ground, supporting a contrary inference than that offered by Appellant. N.T., 12/2/14, at 656. Consequently, we conclude that this claim also lacks merit.

Next, Appellant asserts that the trial court erred when it denied his motion to suppress evidence garnered from a warrant issued to search his iPhone. Appellant contends that the affidavit of probable cause for the search warrant "was, on its face, predicated on the affiant's unconfirmed

conclusions rather than facts." Appellant's Brief at 26. Specifically, Appellant believes that his identity as the shooter was an unconfirmed conclusion that was otherwise unsupported by any facts presented in the affidavit of probable cause.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

The Fourth Amendment to the United States Constitution dictates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

> In determining whether probable cause exists, Pennsylvania applies the "totality of the circumstances" test. *Commonwealth v. Sharp*, 453 Pa. Super. 349, 357, 683 A.2d

1219, 1223 (1996). The duty of this Court is to ensure that the magistrate had a "substantial basis for concluding that probable cause existed." *Id.*

> An affidavit for a search warrant is to be tested by this [C]ourt with common sense and a realistic manner, and not subjected to overly technical interpretations; the magistrate's determination of probable cause is to be accorded great deference on review. The law is clear that before a search warrant may issue, facts supported by oath or affirmation must be presented to the issuing officer which will justify a finding of probable cause. For the warrant to be constitutionally valid, the issuing officer must conclude that probable cause exists at the time the warrant is issued. Such a conclusion may not be made arbitrarily and must be based on facts [that] are closely related in time to the date the warrant is issued.

*Commonwealth v. Baker*, 532 Pa. 121, 126, 615 A.2d 23, 25 (1992) (citations and quotation marks omitted).

> Probable cause is based on a finding of probability, not a prima facie showing of criminal activity. *Id*. The duty of this Court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Id.* The magistrate may not have considered any evidence outside the affidavit in determining whether probable cause has been established.

*Commonwealth v. Days*, 718 A.2d 797, 800 (Pa. Super. 1998) (footnote omitted).

As noted above, Appellant contends that the warrant issued to search his iPhone was based on a conclusion that he was the shooter, which he argues was unsupported by facts set forth in the affidavit of probable cause. However, the trial court, in its opinion accompanying the order denying suppression of this evidence, stated that in "the affidavit of probable cause[,] Detective Day [*sic*] recited the circumstances of the shooting and that [Appellant] *was identified as the shooter.*" Pretrial Opinion, 9/15/14, at

- 15 -

10 (emphasis added). While not a particularly detailed assessment of Appellant's claim, it is apparent from the highlighted language above that the trial court believed that Detective Dey had stated that the shooter had been identified, not that Detective Dey, himself, had identified Appellant as the shooter in a merely conclusory manner.

The affidavit of probable cause, itself, belies Appellant's claim. Therein, after stating that Appellant had been identified as the shooter, Detective Dey set forth the factual basis for that statement, indicating that Appellant's co-defendant, Brandon Midder, who had been stopped in a vehicle with Appellant after the shooting,

> was arrested for [drug offenses] in the vehicle and was transported back to Altoona. Midder was read his rights waiver and consented to a taped interview. In his taped interview he made statements against his penal interest and also, he admitted that [Appellant] was indeed the individual [who] went into the entrance way of the club and shot Solomon several times.

Affidavit of Probable Cause, 12/5/13, at 1.

Therefore, it is clear on the face of the affidavit of probable cause that Detective Dey's statement was not merely conclusory, but had been based on a specific identification made by Appellant's cohort in a taped interview. Accordingly, we conclude that Appellant's suppression claim lacks merit.[6]

_____

[6] Appellant also asserts in his brief that the affidavit of probable cause lacked specificity regarding the timeframe when the supporting information was acquired. Appellant did not raise this claim in his Rule 1925(b) statement, and "[a]ny issues not raised in a 1925(b) statement will be

*(Footnote Continued Next Page)*

- 16 -

Next, Appellant claims that a photo of Solomon taken before his death, and introduced by the Commonwealth at trial, was not relevant. On that basis, he asserts that the trial court abused its discretion by admitting it into evidence. Appellant contends that this photo was essentially the same type of evidence rejected in the landmark case of **Commonwealth v. Story**, 383 A.2d 155 (Pa. 1978). Notably, at trial, Appellant objected on the basis that the Solomon's appearance in the photo "was not the way he looked on the night" he was killed. N.T., 12/1/14, at 113.

In **Story**, the Commonwealth

called Marilyn Wallace, the victim's widow, as its second witness. After [the] appellant sought an offer of proof, the Commonwealth stated that it was calling Marilyn Wallace for the purpose of (1) introducing photographs of the victim and his daughter which Marilyn Wallace had taken when the family was on vacation; (2) describing the victim's family status; (3) relating that Marilyn Wallace had last seen her husband alive on the morning that he was killed; and (4) presenting other events of a personal nature. Appellant objected to the proposed testimony on the ground that it was irrelevant and highly prejudicial. The trial court overruled the objection and permitted Marilyn Wallace to testify.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

deemed waived." **Commonwealth v. Lord**, 719 A.2d 306, 309 (Pa. 1998). Appellant's 1925(b) statement contains a very general claim that the "affidavit of probable cause was, on its face, predicated on unverified conclusions of the affiant and not on facts[.]" Appellant's Rule 1925(b) Statement, 12/29/15, at 2 ¶ 9. While we reluctantly accept that this adequately identified Appellant's claim regarding Detective Dey's identification of Appellant as the shooter, and decline to find the claim waived on that basis, it does not at all resemble Appellant's claim regarding the timeframe established in the affidavit of probable cause.

- 17 -

*Id.* at 157. Our Supreme Court determined that this evidence was "totally irrelevant to the determination of [the] appellant's guilt or innocence[,]" and reversed his conviction, after also determining that the error was not harmless. *Id.* at 160.

However, Appellant's reliance on **Story** does not afford him relief. Here, the only evidence in question is a single photo of the victim. In **Story**, our Supreme Court considered a copious amount of evidence beyond a mere photo, including, *inter alia*, descriptions of the victim's family and the quality of his relationships with them, the positive contributions he made in his community before his death, as well as descriptions of his service in the military and law enforcement. *Id.* at 157-158. No such evidence or testimony concerning the nature or quality of Solomon's life, or anything remotely comparable, was introduced in this case. Moreover, the photos at issue in **Story** depicted the victim with his "daughter[,] which [were] taken when the family was on vacation in Canada." *Id.* at 158. Here, the single photo of Solomon merely depicted him at some time before he was killed, with some slight cosmetic variations from the way he appeared on the night he was killed.

The Commonwealth asserted at the time of Appellant's objection that the photo of Solomon was relevant for the purpose of showing "who Willie Solomon" was and "what he looked like." N.T., 12/1/14, at 112. The trial court determined that the photo was relevant "to the element of the crime of homicide because the prosecution had the burden of proving that Willie

Solomon had been a human being who was alive before he was killed." TCO at 8-9. While this may have been cumulative of other evidence (given the fact that Solomon was identified while still alive in the video surveillance video), it was still relevant. Therefore, we agree with the trial court.

In his brief, Appellant's relies on *Story*, but then makes no argument specific to this case regarding why the photo in question was comparable to the evidence at issue in *Story*. Nor does Appellant directly address the trial court's rationale for rejecting his relevancy objection, that the photo was relevant to the Commonwealth's burden of showing the most basic, albeit implicit, element of homicide – that the victim was a living human being. Moreover, Appellant's specific argument at trial was not that any photo of Solomon before his death was irrelevant for any purpose, but that the specific photo in question was not relevant because it did not depict Solomon in the same manner as he appeared at the time of his death. Appellant has not developed that more nuanced argument in his brief and has, therefore, effectively abandoned it.

Appellant also complains that other evidence in this case, specifically, the video evidence, adequately depicted Solomon, rendering the photo at issue superfluous. However, this argument does not address the relevancy of the photo under Pa.R.E. 401 at all, but instead its admissibility under Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, **or**

***needlessly presenting cumulative evidence***.”) (emphasis added). Appellant did not challenge the photo as being cumulative evidence at trial; he merely objected on relevancy grounds. Accordingly, this aspect of Appellant's claim is waived. ***See*** Pa.R.A.P. 302(a) (“Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.”).

Therefore, for the reasons stated above, we conclude that the photo in question was relevant for the purpose of proving the implicit element of homicide that the victim was a living human being. Appellant's tangential concerns, regarding the photo's failure to depict Solomon in a manner consistent with how he appeared at the time of his death, and the assertion that the photo was merely cumulative of other admitted evidence, have been abandoned and waived, respectively.

Next, Appellant asserts that the trial court erred by refusing to merge the sentences for aggravated assault with a deadly weapon and third-degree murder, as applied to the deceased victim, Solomon. Appellant asserts that merger was required because both offenses arose out of the same 'criminal act,' and because aggravated assault is a lesser-included offense of third-degree murder. The trial court concluded, to the contrary, that these offenses arose out of separate criminal acts. ***See*** TCO at 21 (stating the court “found no … merger under the facts of this case … because of the evidence of separate gunshots and separate non-fatal wounds”). Appellant argues that the criminal information did not allege “separate gunshots or

separate wounds, fatal or non-fatal, distinct from the other count."

Appellant's Brief at 33.

Whether Appellant's convictions merge for sentencing is a question implicating the legality of Appellant's sentence. Consequently, our standard of review is *de novo* and the scope of our review is plenary. **See Commonwealth v. Collins**, 564 Pa. 144, 764 A.2d 1056, 1057, 1057 n. 1 (2001). …

Section 9765 provides:

### § 9765. Merger of sentences

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other.

**Commonwealth v. Baldwin**, 985 A.2d 830, 833 (Pa. 2009).

Appellant's (and the trial court's) assumption that aggravated assault, as charged in this case under subsection (a)(4), merges with third-degree murder, where there is a single criminal act at issue, is simply not correct. The offense of aggravated assault with a deadly weapon[7] includes an

_____

[7] The statute defining the offense of aggravated assault with a deadly weapon provides as follows:

*(Footnote Continued Next Page)*

- 21 -

element not included in the elements of third-degree murder[8] – the use of a deadly weapon. Furthermore, the offense of third-degree murder includes an element not included in the elements of aggravated assault with a deadly weapon – the death of the victim. Accordingly, there is no required 'legal' merger of sentences for assault with a deadly weapon and third-degree murder, because *not* "all of the statutory elements of one of the offenses

*(Footnote Continued)* ─────────────

**(a) Offense defined.—**A person is guilty of aggravated assault if he:

…

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

18 Pa.C.S. § 2702(a)(4).

[8] "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S. § 2501. The statute defining the various degrees of murder reads as follows:

**(a) Murder of the first degree.—**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

**(b) Murder of the second degree.—**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

**(c) *Murder of the third degree.*—**All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502 (emphasis added).

are included in the statutory elements of the other." ***Baldwin***, 985 A.2d at 833. Accordingly, we conclude that Appellant's merger claim lacks merit.

Finally, Appellant argues that the trial court abused its discretion by imposing sentences outside the guidelines. Specifically, Appellant challenges his two aggravated assault sentences of 5-10 years' incarceration each, which were imposed consecutive to his sentence of 20-40 years' incarceration for third-degree murder, and consecutive to one another.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Hoch***, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted).

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
> > [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).
>
> ***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006)

(internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra*, *supra* at 912-13.

As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

Before we reach the merits of his claim, we must first address whether Appellant has satisfied the four-part jurisdictional test. Appellant filed a timely notice of appeal, and a timely post-sentence motion in which he adequately preserved the claims he now presents to this Court. Appellant included a Rule 2119(f) statement in his brief, in which he asserts that he raises a substantial question for our review. Thus, we now turn to whether Appellant presents a substantial question for our review.

In his Rule 2119(f) statement, Appellant alleges that the trial court exceed the sentencing guidelines without adequate justification. This presents a substantial question. *See Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa. Super. 2008) (holding the "contention that the sentencing

court exceeded the recommended range in the Sentencing Guidelines without an adequate basis raises a substantial question for this Court to review"). Appellant's assertion that his sentence is manifestly excessive also presents a substantial question for our review. *Commonwealth v. Kelly*, 33 A.3d 638, 640 (Pa. Super. 2011) ("A claim that a sentence is manifestly excessive such that it constitutes too severe a punishment raises a substantial question.").

Appellant also alludes to the trial court's failure to address his rehabilitative needs at sentencing. The failure to *adequately* address sentencing factors does not present a substantial question for our review. *See Commonwealth v. Mobley*, 581 A.2d 949, 952 (Pa. Super. 1990) ("A challenge to the weight accorded sentencing factors does not raise a substantial question absent extraordinary circumstances."). However, "a substantial question exists when a sentencing court imposed a sentence in the aggravated range without considering mitigating factors." *Commonwealth v. Rhoades*, 8 A.3d 912, 919 n.12 (Pa. Super. 2010). Thus, as Appellant was sentenced in or above the aggravated range for his aggravated assault convictions, we find that he presents a substantial question to the extent that he claims the court failed to consider certain sentencing factors in crafting his sentence. However, to the extent that he argues the court did consider sentencing factors, but failed to afford those factors adequate weight, he does not present a substantial question for our

review. Thus, we now turn to the merits of Appellant's reviewable sentencing claims.

Appellant's challenge focuses on the propriety of his statutory maximum sentences for third-degree murder and aggravated assault, which were ordered to run consecutively. Appellant essentially alleges that the trial court "fixated" on the seriousness of the offense, without giving adequate regard to the fact that the guidelines already contemplated the seriousness of his offense. Appellant's Brief at 39. Appellant also claims the trial court "did not demonstrate clarity" in its understanding of the sentencing factors set forth in 42 Pa.C.S. § 9781(d), and afforded only boilerplate assertions in justification of Appellant's sentences. Appellant also asserts that "[n]othing differentiates his conviction of any of the three consecutive components from the typical case." Appellant's Brief at 40.

Regarding the allegation that the court "fixated" on the seriousness of his offense, Appellant offers little support from the record to substantiate this claim. In the statement attached to its sentencing order, the trial court stated that it was "aware of the nature and circumstances of the crimes" and "has learned the history, character and condition of the defendant through the presentence investigation and the presentations at sentencing." Sentencing Order, 1/30/15, 7. The court then proceeded to discuss the gravity of the crimes at issue, which include violent behavior against two individuals, ultimately resulting in the death of Solomon. *Id.* at 7-8. After discussing the gravity of these crimes (albeit with some unnecessary

- 26 -

rhetorical flair), the trial court then noted several factors, beyond the crimes themselves, which demanded additional attention. For instance, the trial court was concerned that, following his crimes (and despite his self-defense claims), Appellant fled from the scene of the crime and further attempted to elude authorities by giving a false name to law enforcement. *Id.* at 8. Consequently, the court believed these additional factors, not directly related to his third-degree murder and aggravated assault convictions, demonstrated that Appellant was "at high risk to repeat those actions, unless he receives a lengthy period of correctional treatment in an institution." *Id.*

The trial court then reiterated its consideration of the pre-sentence report. *Id.* Notably,

> [w]here pre-sentence reports exist, we shall continue to presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself. In order to dispel any lingering doubt as to our intention of engaging in an effort of legal purification, we state clearly that sentencers are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion. It would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand.

*Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super. 2009).

Accordingly, we must presume that the court considered all relevant mitigating evidence concerning Appellant's character, age, criminal and personal history, past rehabilitative efforts, and future rehabilitative needs. Appellant did present a single challenge to the content of the pre-sentence report at his sentencing hearing, contesting the inclusion of the fact of his arrest in New York on assault charges. On appeal, Appellant no longer contests the content of that report, a report which concluded with a recommendation for the sentence actually issued in this case (consecutive, statutory maximums for third-degree murder and aggravated assault). Our review of the sentencing court's statement indicates that the court did not solely rely, or 'fixate,' on the gravity of Appellant's crimes. Appellant's minimal and cursory argument to the contrary does not convince us otherwise.

Appellant next alleges that the trial court did not demonstrate clarity in its understanding of the sentencing factors set forth in 42 Pa.C.S. § 9781(d). This claim is puzzling, since Section 9781(d) directs appellate courts, not trial courts, in the review of sentences *on appeal*. **See** 42 Pa.C.S. § 9781(d) ("In reviewing the record the appellate court shall have regard for: (1) The nature and circumstances of the offense and the history and characteristics of the defendant[;] (2) [t]he opportunity of the sentencing court to observe the defendant, including any presentence investigation[;] (3) [t]he findings upon which the sentence was based[; and] (4) [t]he guidelines promulgated by the commission.").

Nevertheless, even assuming Appellant is referring to the trial court's understanding of statutory sentencing factors set forth in 42 Pa.C.S. § 9721 ("the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant"), we conclude that this claim lacks merit. As discussed above, the trial court addressed each of these factors in the statement issued contemporaneously to the sentencing order. In that statement, there does not appear to be any 'lack of understanding' apparent on its face and, in any event, Appellant's bald allegation that the court's understanding was lacking is not a sufficient basis to conclude otherwise.[9]

Appellant next claims that nothing about his crimes was extraordinary or so unique so as to justify the imposed sentence. However, Appellant makes this allegation without any reference to the facts of this case, and without any attempt to describe or identify what constitutes a "typical" third-degree murder, or a "typical" aggravated assault, or how his conduct conformed to such norms. Accordingly, we find this argument to be waived

---

[9] Indeed, a bald allegation of error does not even constitute a substantial question for our review. *See Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) ("As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors.").

due to inadequate development. *See **Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007) ("This Court will not act as counsel and will not develop arguments on behalf of an appellant.  Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.") (citation omitted).

Finally, although Appellant's complaints are premised on the trial court's upward departure from the standard sentencing guidelines, he provides no discussion of his prior record score (hereinafter "PRS"), the offense gravity score applicable to his various offenses, or the applicable sentencing ranges for each of his offenses.  Appellant does not discuss his rehabilitative history (if any), his prior criminal record (if any), or mitigating facts he brought forward at sentencing (if any).  As such, this Court has little information upon which to even begin to contemplate the extent to which the trial court's departure from the guidelines was or was not reasonable.

As Appellant acknowledges, his sentence for third-degree murder, 20-40 years' incarceration, constituted a standard range sentence, as the statutory limit for that offense is identical to the upper limit of the standard guideline sentencing range for that same offense.  *See* 42 Pa.C.S. § 303.16 (Basic Sentencing Matrix).  We can also ascertain from the guidelines that, if Appellant had the maximum PRS, 'RFEL,' his 5-10 year sentences for aggravated assault would constitute aggravated range sentences, not sentences 'outside the guidelines.'  *Id.*  However, these same sentences are

clearly 'outside the guidelines' for any other PRS.  Unfortunately, because Appellant fails to reference to these critical facts in his argument, we can neither assess whether his sentences were 'within the guidelines,' nor, if they were outside the guidelines, the magnitude of the trial court's departure from them.  Appellant fails to direct our attention to where in the record this information can be found, and our efforts to review the sentencing order, the sentencing transcript, and the various other sentencing-related documents in the record, have failed to uncover such information.[10]  The omission of this information from the record must ultimately resolve against Appellant, because "[i]n general, it is an appellant's burden to ensure that the certified record contains the documents reflecting the facts needed for review."  *Commonwealth v. Wrecks*, 931 A.2d 717, 722 (Pa. Super. 2007).  Moreover, this Court may deem waived any claim that is not sufficiently developed for appellate review.  *See Hardy*, *supra*.  In sum, we have endeavored to address as many specific arguments raised by Appellant in his brief regarding the

---

[10] The only reference to Appellant's prior record (but not, specifically, his prior record score), appears at the beginning of the sentencing transcript, where Appellant's sentencing counsel argues that he "disagree[d] with the statement [in the pre-sentencing investigation report] that he has a prior record."  N.T., 1/30/15, at 1.  The statements of counsel are not evidence, and the pre-sentence report is not contained in the certified record.  In any event, Appellant fails to assert at any point in his brief to this Court that he did not have a prior record, nor does he assert any specific value for his PRS.

discretionary aspects of his sentence, but we find each of those issues to be either meritless, waived, or not addressable under our substantial question doctrine, for the reasons stated above.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/2017