**[J-21-2022] [MO: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 19 WAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior Court |
| | : | entered February 9, 2021 at No. 938 WDA |
| | : | 2019, affirming in part and vacating in part |
| v. | : | the Judgment of Sentence of the Court of |
| | : | Common Pleas of Allegheny County entered |
| | : | June 5, 2019 at No. CP-02-CR-0004460- |
| DEMETRIUS CARLOS COLEMAN, | : | 2017, and remanding. |
| | : | |
| Appellant | : | ARGUED:  April 12, 2022 |
| | : | |
| | : | |

**DISSENTING OPINION**

**JUSTICE WECHT** **DECIDED: NOVEMBER 23, 2022**

On November 24, 2016, Demetrius Coleman led police on a high-speed chase along Route 30 in Allegheny County.  The chase ended in tragedy when Coleman—who was travelling at speeds exceeding 100 miles per hour, weaving in and out of lanes, and driving against traffic in the opposite lane of travel—collided with another vehicle.  The collision caused that other vehicle, which contained three people, including a two-year-old girl, to go airborne and crash into a utility pole.  All three occupants of the vehicle died instantly and simultaneously.

Coleman was charged, and later convicted, of three counts of third-degree murder. Typically, a conviction for third-degree murder carries a maximum sentence of forty years.[1]  However, upon notice from the Commonwealth, 42 Pa.C.S. § 9715 requires a

---

[1]     *See* 18 Pa.C.S. § 1102(d).

trial court to sentence a person convicted of third-degree murder to a life sentence if that person "*has previously been convicted at any time of murder . . . .*"[2]

The question in this case is whether this anti-recidivist provision applies in a case where:  (1) three murders occur simultaneously; and (2) the defendant was tried for all three murders in a single trial, and (3) convicted of all three in the same jury verdict; and (4) sentenced for all three in a single proceeding, resulting (5) in one judgment of sentence.  The Majority finds no ambiguity in the phrase "previously been convicted at any time," and determines that the mandatory sentencing provision applies in these circumstances.  This conclusion is plainly incorrect.  It also leads to an interpretation that stands in stark opposition to the General Assembly's intent and writes two critical provisions out of the statute.  Because we are precluded from interpreting statutes in this way, I respectfully dissent.

When interpreting a statutory provision, this Court is bound to the guidelines and objectives of the Statutory Construction Act.[3]  Under the Act, the overarching goal of statutory interpretation is "to ascertain and effectuate the intention of the General Assembly."[4]  To this end, the Act mandates that "[e]very statute shall be construed, if possible, to give effect to all its provisions,"[5] and that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage."[6]

---

[2]      *Id.* § 9715(a) (emphasis added).

[3]      *See* The Statutory Construction Act of 1972, codified at 1 Pa.C.S. §§ 1501-1991 (the "Act").

[4]      *Id.* § 1921(a).

[5]      *Id.*

[6]      *Id.* § 1903(a).

The first step required in any exercise in statutory interpretation is a consideration of whether the contested statutory term is ambiguous. This is because "[w]hen the words of a statute are clear and free from all ambiguity,"[7] the plain language controls, even if that language appears to be inconsistent with the General Assembly's intent. "[T]he letter of [the statutory language] is not to be disregarded under the pretext of pursuing its spirit."[8] If the term bears no ambiguity, the words of the provision control, and our analysis ends. When the term is ambiguous, an interpreting court must consult the other canons of interpretation set forth in the Act.

A "statute is ambiguous when there are at least two reasonable interpretations of the text."[9] Stated differently, when a statute can be read "in two different ways and the statutory language is reasonably capable of either construction, the language is ambiguous."[10] Here, the Majority finds the phrase "previously been convicted at any time to be clear and unambiguous,"[11] *i.e.*, susceptible to only one reasonable interpretation. This conclusion is perplexing in view of the embedded redundancy within the statutory phrase. This redundancy gives rise, at a minimum, to substantial and reasonable dispute as to the meaning of this phrase.

It is not at all challenging to ascertain the common meaning or understanding of the two terms at the heart of the instant dispute. The first is the term "previously," which indisputably refers to events that occurred at some earlier point in time. When a person says to another that "I have previously seen a medical specialist," no one reasonably can

---

[7]     1 Pa.C.S. § 1921(b).

[8]     *Id.*

[9]     *A.S. v. Pennsylvania State Police*, 143 A.3d 896, 905-06 (Pa. 2016).

[10]     *Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016).

[11]     *See* Maj. Op. at 14.

dispute that the person's visit to the specialist happened at some point prior to the conversation. The phrase "at any time," taken in isolation, similarly presents little definitional complexity. Taking the General Assembly at its words, "at any time" literally means at any point in time, including any that comes before, after, or simultaneous to, the reference point.

The Majority bypasses the patent redundancy that results when the two terms—"previously" and "at any time"—are used in the same phrase. Because "at any time" means "any point in time," the phrase necessarily includes those things that have already occurred. In other words, "at any time" includes all those things that have happened "previously." That means that, if the Majority's interpretation is the only reasonable one, the term "previously" is not only redundant; it also can be written out of the statute without any consequence to the Majority's understanding of the term. However, we are required under the Act to construe each statute in a manner that "give[s] effect to all its provisions."[12] We are not permitted to rewrite statutes, nor to interpret them in a way that eliminates one of the General Assembly's chosen terms, as the Majority does here.

The Majority concludes that "previously" and "at any time" can operate in the same statute without redundancy by ignoring the fact that the former term is entirely subsumed by the latter. The Majority correctly defines "previously" to refer to those events that have happened "before in time."[13] Then, the Majority ventures that the term "at any time" serves only to resolve any lingering doubts as to whether a simultaneous, or near-simultaneous, conviction also triggers the mandatory life sentence. When ascertaining whether a statute is ambiguous, we are required to give each contested term its plain meaning. Although the Majority does so with regard to "previously," it loses its way when

---

[12]     1 Pa.C.S. § 1921.

[13]     Maj. Op. at 13.

interpreting "at any time." The term means literally what it says: at any time. That temporal period unquestionably must include those events that occurred "previously." There is no reason to believe that the General Assembly intended "at any time" to modify "previously," or to divest that word of its plain meaning. If the General Assembly wanted to make that contradiction or "clarification," it would have said so clearly. All we are required—and all we are able—to do now is assign terms their plain meaning. Despite the Majority's misguided insistence, "at any time" does not mean "in case the sentencing court is confused, 'previously' also refers to murders tried in the same case for which the defendant is being sentenced." Rather, it means literally what it says—at any time—a time frame that, without question, swallows up the term "previous." The redundancy is patent.

It is easy to see this redundancy. Indeed, it is unavoidable. Consider how the statute would change if the term "previously" is removed. *It does not change at all.* Every preceding murder that would be considered to have been committed "previously" would have to be considered by the sentencing court because that murder was committed "at any time." By refusing to recognize the redundancy, and, hence, the ambiguity, the Majority renders the term "previously" nothing more that surplusage.

In another attempt to justify its misinterpretation, the Majority leans upon this Court's decision in *Commonwealth v. Vasquez*,[14] a decision wholly distinguishable and inapplicable here. In that case, the mandatory sentencing statute was triggered "if at the time of sentencing the defendant has been convicted of another drug trafficking offense."[15] The statute at issue in *Vasquez* did not contain the terms "previously" or "at

---

[14]    753 A.2d 807 (Pa. 2000).

[15]    18 Pa.C.S. § 7508(a)(3)(i) (held unconstitutional in *Commonwealth v. DiMatteo*, 177 A.3d 182, 191 (Pa. 2018)).

any time." Because our interpretive task here requires us to consider only the plain meaning of the terms used in the statute being challenged, and because the terms here do not appear in the statute challenged in *Vasquez*, that precedent has no application whatsoever in this case. We interpreted entirely different statutory terms. The apples to oranges comparison is entirely inapt in a plain language analysis.[16] There is another compelling reason to reject the Majority's conclusion that no ambiguity exists within the terms of this statute: its interpretation conflicts directly with subsection (b) of § 9715. It is axiomatic that a statute cannot be deemed to be unambiguous when it prevents the execution of another aspect of the same law.

It is well-established that ambiguity can arise when considering the contested language within the context of the overall statutory scheme. As the Supreme Court of the United States has explained, "oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme."[17] The Majority acknowledges this fundamental

---

[16] Furthermore, as the Majority recounts, the drug transactions in *Vasquez* occurred "ten days apart," "requir[ed] separate planning and execution," and "were [not] contingent upon each other." *Vasquez*, 753 A.2d at 809. *Vasquez* is neither factually nor legally comparable. The Majority highlights *dicta* in that case, in which this Court stated that "even if we were to conclude that these transactions could be construed as a single criminal episode," the mandatory sentencing provision "specifically focuses on a defendant's prior 'convictions' at the time of sentencing, and makes no distinction between convictions that arise from a multiple count complaint, or a separate complaint." *Id.* Even if this *dicta* were binding, it still would have no resonance here because it was premised entirely upon statutory language that bears little, if any, similarity to the terms being challenged in this appeal. While both statutes use the term "conviction" in some form, that is the only similarity, and the arguments in this case center upon "previously" and "at any time." Simply put, *Vasquez* has no binding effect in this case, nor does it carry any persuasive weight.

[17] *King v. Burwell*, ___ U.S.___, ___, 135 S.Ct. 2480, 2489 (2015) ((internal quotation marks and citations omitted); *see also Yates v. United States*, ___ U.S.___, ___, 135 S.Ct. 1074, 1081-82, (2015) ("'[T]he plainness or ambiguity of statutory language is

principle, but does not apply it.[18]  Sections of the same statute must be considered "together and in conjunction with each other," and construed "with reference to the entire statute."[19]  We "are not permitted to ignore the language of a statute, nor may we deem any language to be superfluous."[20] Here, that means that we cannot ignore subsection (b).

In that subsection, the General Assembly outlined precisely what must occur before a trial court is bound to apply the mandatory life sentence.  In no uncertain terms, the General Assembly stated that "prior to imposing sentence on an offender under subsection (a)," the court "shall have a complete record of the previous convictions of the offender."[21]  The Majority finds that Coleman had "previously" been convicted, even though this predicate murder occurred at the same time and was tried in the same proceeding as the murder for which the Commonwealth sought the life sentence.  Yet, at the same time, the Majority finds inapplicable a provision that requires the court to have a complete record of the "previous convictions." If, as the Majority deems it to be, Coleman's conviction in this case counts as "previous" for subsection (a), then it must also be "previous" for subsection (b).  It cannot be any other way.

---

determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." (internal citations omitted); *Giulian*, 141 A.3d at 1267-68.

[18]     Maj. Op. at 20 (noting that we must read "Section 9715 as a whole").

[19]     *Hous. Auth. of County of Chester v. Pa. State Civil Serv. Comm'n*, 730 A.2d 935, 945 (Pa. 1999).

[20]     *Commonwealth v. McCoy*, 962 A.2d 1160, 1168 (Pa. 2009) (citing 1 Pa.C.S. § 1921(a)).

[21]     42 Pa.C.S. § 9715(b).

Needless to say, the Majority is forced to take this inconsistent approach because, otherwise, its preferred interpretation quickly collapses upon itself. Disregarding subsection (b) creates a logical and practical impossibility. A court cannot have a "complete record" of the "previous conviction" if that record is still being created. At the very minimum, a "complete record" would contain a final judgment of sentence. Here, however, Coleman was issued one consolidated judgment of sentence, and that order was being generated as sentencing progressed. The record was not, and could not have been, a "complete record" of the conviction for purposes of subsection (b).

.

There also is no support for the Majority's claim that subsection (b)'s "complete record" requirement "includ[es] but [is] not limited to those outside of the particular case at hand."[22] The Majority construes "complete record" to include those records being created in the very case for which the defendant is currently being sentenced. Ignoring for the moment the fact that the statute contains no such "including but not limited to" language, the premise fails because it is based upon a misinterpretation of the term "complete record." The Majority seems to think that "complete" somehow refers to information that has yet to enter the case record. The Majority offers no support for this interpretation. This is unsurprising as it clearly belies the common understanding of the term. No common understanding of the term "complete record," in either the legal community or in everyday parlance, would include a record that currently is in the process of being generated. At the very minimum, a "complete record" in a criminal case would include a judgment of sentence. Notably, here, the judgment of sentence is a single document listing all of the individual sentences on each count—a record created necessarily *after* the trial court imposed sentence in open court. At the time that the trial

---

22      Maj. Op. at 17.

court would have had to impose a life sentence, as the Majority now requires, there was not even a formal judgment of sentence issued for the predicate third-degree murder.[23] This incomplete, in-progress creation of the record magically suffices for the Majority as a "complete record."

Seemingly recognizing that the ordinary understanding of the term "complete record" does not comport with its conclusion, and ignoring our obligation to assign terms their ordinary meaning, the Majority instead chooses to give the term an entirely new and more convenient meaning. For the first time ever, the term "complete record" now is said to require only a "finding of guilt."[24] To my knowledge, and according to my research, *never before in Pennsylvania* has the record in a case referred only to the jury's determination of guilt.[25] When an appellate court requires transmission of a record to its

---

[23] The Majority contends that the necessary inclusion of "judgment of sentence" within "complete record" is somehow an "effort to manufacture ambiguity," and one that leads to an "absurd result" at that. *Id.* at 19 n.7. Putting aside for the moment the absurdity of interpreting a foreperson's in-court announcement of a verdict as a "complete record" (an interpretation wholly foreign to criminal practice in Pennsylvania and in any other American jurisdiction as far as I can tell), the Majority does not explain what is "absurd" about the long-settled understanding of a complete record as requiring, oddly enough, a *complete* record (including, *inter alia*, a judgment of sentence). The Majority simply references the statute's use of the word "conviction," which begs the question and gives us no cause to ignore the word "complete" in the term "complete record." Had the General Assembly simply intended that we have some indication that a person was found guilty of the murder in question, at some (or at any) point in time, the General Assembly could have written that. Instead, the legislators chose to require the production of a "complete record," which always has entailed more than a recitation of a guilty verdict, notwithstanding the Majority's contrary imagination. It is hardly surprising that the Majority offers not a single case in which this (or any other court) deemed "complete record" to mean anything less than what it says. Nowhere in our jurisprudence do we find support for the—yes, absurd—interpretive feint by which "complete" is magically transformed into "incomplete." But there is always a first step on the road to confusion, and the Majority has now taken us there.

[24] *Id.* at 20.

[25] In an effort to support its novel claim that "complete record" means nothing more than a "finding of guilt," the Majority cites *Commonwealth v. Allen*, 494 A.2d 1067, 1071

prothonotary for purposes of deciding an appeal, no appellant would submit a verdict form and believe his or her task complete. Similarly, when a lawyer seeks to inspect a record of a defendant's past criminal history, the Clerk of Courts does not provide that lawyer with a single sheet of paper or a verdict slip. A record is a full documentary accounting of a case, comprised of every document generated, every motion filed, every transcript produced, etc. Never before, and I venture to guess likely never again, will a "complete record" of a case be understood by this Court to comprise only a "finding of guilt."[26] That

_____

(Pa. 1985), for the proposition that "the existence of a prior conviction is a simple historical fact which may be ascertained through official documents." But subsection 9715(b) does not require mere proof of "the existence" of a prior conviction. That subsection, which applies any time the Commonwealth seeks the imposition of a mandatory life sentence under its terms, requires the production of a "complete record." It cannot reasonably be maintained that the demonstration necessary to prove the mere "existence" of a prior conviction and that necessary to account for the "complete record" pertaining to that conviction are the same thing. If anything about this statute is plain, it is the term "complete record." It hardly seems disputable that it can mean anything other than the entirety of the record.

[26] The Concurrence also would construe the term "complete record" as requiring proof of nothing more than some form of proof of a "previous finding of guilt." Conc. Op. at 5. On the way to this conclusion, the Concurrence focuses upon the use of the word "convicted," and then opines that the term has a "popular" meaning and a "technical" meaning. Apparently believing that the General Assembly knew about, and understood, this dichotomy, the Concurrence ventures that the General Assembly must have intended to use the "popular" understanding of the term in subsection (a), and, thus, must have intended the same meaning in subsection (b). The Concurrence concludes on this basis that a "complete record" is nothing more than proof of a "finding of guilt," which does not include a judgment of sentence. Like the Majority, the Concurrence offers no instance in which a "complete record" has ever been interpreted in this way. This is unsurprising, because no such interpretation exists (prior to today).

The Concurrence cites *Commonwealth v. Beasley*, 429 A.2d 460 (Pa. 1984), and *Commonwealth v. Travaglia*, 467 A.2d 288 (Pa. 1983), both of which held that a judgment of sentence is not required for proof of a "conviction" for purposes of establishing an aggravating circumstance in a death penalty case. Neither case has any bearing here, because the aggravating circumstance statute, 42 Pa.C.S. § 9711(d), at issue in those appeals does not require the prosecutor to provide the court with a "complete record." The statute and the two cases relied upon by the Concurrence involve different statutory

is, never before until today.  It is hardly compelling to claim that this is the "plain" meaning

of the term when it never has been understood in this way before, by anyone.

Every time that the enhancement is pursued, the General Assembly requires, at

sentencing, the court to review "a complete record of the previous convictions."  That did

not occur here, because it could not occur here.  By holding steadfast to its conclusion

that no ambiguity exists in this statute, the Majority effectively writes subsection (b) right

out of the statute, despite its own recognition that we are required to interpret a statute

by considering all of its provisions and how those provisions work together to complete a

workable statutory scheme.  Subsection (b) is an important, and mandatory, aspect of

---

language and different legislative intent.  They shed no light on what the statute at issue
in this case means.

But let us suspend disbelief, and assume for argument's sake that the General
Assembly somehow contemplated the two proffered meanings of "convicted."  This still
would not tell us that the common meaning of the term "complete record" can be ignored.
If the General Assembly intended that the prosecutor provide the sentencing court with
only some proof of a "previous finding of guilt," it could have said so.  It didn't.  Instead,
the General Assembly required that the prosecutor present a "complete record."  Like any
term, this one must be afforded its common understanding and meaning.  Neither the
Majority nor the Concurrence attempts to demonstrate that "complete record," even if the
term refers only to a conviction, commonly is understood to mean just any proof, of
whatever form, that the person had been found guilty at some point in time.

Further proof that the term "complete record" does not mean what the Majority and
Concurrence want it to mean is the conspicuous absence of any examples of what proof
of "a previous finding of guilt" looks like.  Neither the Majority nor the Concurrence
illuminates for sentencing courts what must be included in order to comprise a "complete
record of a previous finding of guilt."  Does this mean the verdict slip?  A page from a
transcript?  A certified copy of the conviction generated by the Clerk of Courts?  All of
these?  The reason for the dearth of explanation or example is obvious.  No one knows
what this new creature looks like.  And that is because this new interpretation of the term
is not the common understanding of the term and could not have been what the General
Assembly intended.  Never in our history has the term "complete record" meant only one
page or item from a record.  We should not pave this strange new path here.

that scheme. Giving that section its due, it is clear that the Majority's interpretation cannot stand as the only reasonable one.

By giving full effect to the term "previously," the statute also can be interpreted to require proof of a conviction from an entirely separate case, one involving different facts, a different trial, and a different judgment of sentence. There is also a third option. In its *amicus* brief, the Defender Association of Philadelphia argues that "at any time" refers not to when the prior conviction occurred in relation to the conviction for which the defendant is being sentenced, but instead refers to the remoteness (or lack thereof) of the previous conviction.[27] In other words, "at any time" was meant by the General Assembly to preclude any claim that the prior conviction was too remote in time to be counted as the predicate murder for purposes of § 9715(a), such that a conviction from forty years ago counts for purposes of the statute in the same way that a conviction from two years ago does. This, too, is a reasonable interpretation of the statute.

In my view, the Majority's cursory analysis of the key statutory language does not suffice to tease out the ambiguity inherent in the phrase at issue. Because there are multiple, reasonable interpretations that can result from the common understandings of these terms, the term is ambiguous.

> Where statutory or regulatory language is ambiguous, this Court may resolve the ambiguity by considering, *inter alia*, the following: the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute.[28]

---

[27] *See Amicus* Brief for Defenders Association at 11-12.

[28] *Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 131 A.3d 977, 984 (Pa. 2016) (citing 1 Pa.C.S. § 1921(c)).

As such, our interpretive goal shifts from implementation of plain language to discernment of legislative intent.

It is clear that the General Assembly aimed § 9715 at recidivist offenders.[29] Were the objective anything other than punishing a person who has been convicted of murder after already having been given a second chance at freedom following an earlier murder conviction, undoubtedly the General Assembly would have said so. "As a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[;][o]ne must also listen attentively to what it does not say."[30] Had the General Assembly intended the trial court to merely count convictions, regardless of when they occurred, the General Assembly could have omitted the word "previously." Or, the General Assembly could have said: "Any person with two or more convictions of third-degree murder shall be sentenced to life imprisonment." But that is not what the General Assembly said. The General Assembly used the word "previously," which we cannot just ignore or fold into another statutory provision. The use of that term strongly supports both the obvious legislative intent of punishing recidivist offenders and an interpretation requiring some separation between the predicate murder and the one for which the defendant is being punished. It is difficult, if not impossible, to believe that the General Assembly made the effort to include temporal terms in the statute if all that it really meant to accomplish was to have the court scour the defendant's record for the existence of one other conviction anywhere in the person's history, including one rendered contemporaneously or mere seconds earlier.

---

[29]    *See, e.g.*, *Commonwealth v. Gonzales*, 609 A.2d 1368, 1372 (Pa. Super. 1992) (referring to § 9715(a) as a "recidivist sentencing provision").

[30]    *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001) (internal quotations omitted).

The Majority's interpretation conflicts directly with the anti-recidivist philosophy of this provision. Instead of punishing repeat offenders as intended, the Majority construes the statute to apply to those third-degree murderers whose convictions occur all at once, and who have never had the opportunity to demonstrate that they will not reoffend. In *Commonwealth v. Dickerson*, we spoke to the dangers of misinterpreting anti-recidivist statutes in this way:

> It was not intended that the heavier penalty prescribed for the commission of a second offense should descend upon anyone, except the incorrigible one, who after being reproved, 'still hardeneth his neck.' If the heavier penalty prescribed for the second violation ... is visited upon the one who has not had the benefit of the reproof of a first conviction, then the purpose of the statute is lost."[31]

We emphasized that the "point of sentence enhancement is to punish more severely offenders who have persevered in criminal activity despite the theoretically beneficial effects of penal discipline."[32] The Majority's interpretation allows courts to engage in nothing more than a counting exercise, tallying up the total number of convictions, but paying no mind whatsoever to the anti-recidivist intent of the statute.

The only interpretation that is consistent with that philosophy—and with the rule of lenity, which requires ambiguous penal statutes to be construed in favor of the accused,[33]—requires that the predicate murder conviction be separate and apart from the conviction upon which the defendant is being sentenced. That means that the two (or more) convictions must arise from a separate legal case that preceded the current one. No other interpretation comports with the provisions of the Act.

Because the Majority finds otherwise, I respectfully dissent.

---

[31] 621 A.2d 990, 992 (Pa. 1993) (citations omitted).

[32] *Id.*

[33] 1 Pa.C.S. § 1928(b)(1).